IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| LISA REITMAN | ) | |
| | ) | |
| Plaintiff, | ) | No. 24 C 7648 |
| | ) | |
| v. | ) | Judge Robert W. Gettleman |
| | ) | |
| EVANSTON/ SKOKIE COMMUNITY | ) | |
| CONSOLIDATED SCHOOL DISTRICT 65, | ) | |
| DR. ANGEL TURNER, LAUREN | ) | |
| VALVERDE, DR. ANDALIB KHELIGHATI, | ) | |
| ANNA SHKLOVER, KELLY KROFEL, | ) | |
| LARISA ACEVEDO, KATHY | ) | |
| ZALEWSKI, DR. TRISHA BAKER, and | ) | |
| CHINA SARIA | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION & ORDER**

Plaintiff brings this seven-count complaint against Evanston/ Skokie Community

Consolidated School District 65 ("District 65"), Dr. Angel Turner, Lauren Valverde, Dr. Andalib

Khelighati, Anna Shklover, Kelly Krofel, Larisa Acevedo, Kathy Zalewski, Dr. Trisha Baker,

and China Saria (collectively "defendants"). Count One alleges that District 65, Khelighati,

Valverde, and Shklover interfered with plaintiff's rights afforded under the Family and Medical

Leave Act ("FMLA"). Count Two alleges that all defendants deprived plaintiff of a protected

property interest—early retirement—without due process of law. Counts Three and Four were

voluntarily dismissed by plaintiff. Count Five alleges that District 65 breached its contractual

obligations to plaintiff under the "Professional Agreement between the Board of Education of

School District No. 65 Evanston, Illinois and District 65 Educators' Council for School Years

2019-2020 through 2023-2024" ("the Agreement"). Count Six asserts promissory estoppel

against District 65, Valverde, and Shklover.  Count Seven alleges that all defendants intentionally inflicted emotional distress on plaintiff.  Baker moves to dismiss Counts Two, Three, Four, and Seven (Doc. 19).  Defendants move to dismiss all counts (Doc. 21).  For the reasons explained below, defendants' motion is denied in part, with respect to Count One, and granted as to all other counts.  Baker's motion to dismiss is granted.

## **BACKGROUND**

This is a case about a teacher who was allegedly subjected to bureaucratic incompetence at a time when she deserved administrative support.  Plaintiff was a teacher at District 65 for thirty-four years.  At the end of the 2022-23 school year, plaintiff sought early retirement to take care of her husband who was dying of terminal brain cancer.  Despite plaintiff's repeated efforts to confirm that she had accumulated enough unused sick days to allow her to retire with a full, non-reduced pension at the end of the 2022-23 school year, plaintiff discovered that defendants had improperly calculated her eligible sick days that could count towards her retirement.  As a result, plaintiff was informed by the Teachers' Retirement System of the State of Illinois ("TRS") that her pension would be reduced by 24% or $1,558 per month from the full, non-reduced pension she had expected based on defendants' assurances.  In fall 2023, plaintiff was able to work eight more days to qualify for her full, non-reduced pension.  A more detailed factual account follows.

Plaintiff first advised District 65 that her husband had been diagnosed with a malignant brain tumor in 2020.[1]  As her husband's condition worsened during the 2022-23 school year,

---

[1] The following factual account is drawn from plaintiff's complaint and construed as true.  Virnich v. Vorwald, 664 F.3d 206, 212 (7th Cir. 2011).

plaintiff began to reach out to District 65 to determine how many unused sick days she had accumulated and how many she would need to meet the requirements to receive a full pension when she retired at the end of the year. Plaintiff first submitted her notification of retirement to Khelighati on February 1, 2023. On February 3, 2023, plaintiff contacted other staff members indicating that she had not yet received a response from Khelighati. On February 6, 2023, plaintiff contacted Valverde seeking confirmation and clarification of her sick day balance. Valverde responded on February 13, 2023. On the same day, plaintiff scheduled a meeting with Valverde, which occurred on February 16, 2023.

During the meeting on February 16th, Valverde confirmed with plaintiff that for her to retire with full benefits, she needed 194 days in her sick bank to submit to TRS when she retired. Through a series of communications between Valverde and plaintiff in the weeks following the meeting, Valverde confirmed that plaintiff had 215 sick days, which exceeded the 194 sick days require to qualify for a full retirement.

In the spring of 2023, the health of plaintiff's husband continued to deteriorate, requiring plaintiff to take time off to care for him. With the understanding that she had more unused sick days than required to qualify for a full retirement, plaintiff sought to use her excess sick days to care for her husband. Plaintiff contacted Valverde to confirm that she had excess sick days and to share her plan to use those days to care for her husband. A series of communications in March and May 2023 show that Valverde confirmed that plaintiff had excess sick days available and was aware of plaintiff's plan to use them:

- On March 24, 2023, Valverde emailed plaintiff indicating that she had checked plaintiff's sick days at the close of business on March 24, 2023, and confirmed that plaintiff had 209

3

sick days remaining.

- On May 5, 2023, Valverde responded to an email from plaintiff outlining her plan to use her 15.4 extra sick days (the difference between her balance of 209.4 sick days and the 194 required for full retirement) saying "use those extra days as you need them."

- On May 8, 2023, plaintiff again asked Valverde to confirm that she had 209.4 sick days and needed to contribute 194 to TRS to qualify for full retirement. Valverde added Shklover, a human resources information system analyst, to the email thread between her and plaintiff so that Shklover could confirm that plaintiff had the requisite sick days to take care of her husband and receive a full retirement. Shklover never responded to the email.

Despite her extensive efforts to ensure that her plan to take leave would not jeopardize her retirement, plaintiff was mistaken. On May 8, 2023, plaintiff emailed Valverde a scanned image of a TRS document that indicated that plaintiff had 194 creditable sick leave days, fewer than the 209.4 days she thought she had. Valverde failed to inform plaintiff that if she took the days off that she planned to, she would not have the necessary number of eligible unused sick days to submit to TRS to qualify for a full, non-reduced retirement pension. Despite being informed on both May 8th and 22nd that plaintiff planned to take off the remainder of the year to take care of her husband, Valverde did not provide plaintiff with the proper documentation and information to allow her to use FMLA leave. It is uncontested that plaintiff would have been entitled to FMLA leave given her husband's serious medical condition. Plaintiff's husband died on May 24, 2023.

On September 18, 2023, plaintiff learned that District 65 had miscalculated her creditable

sick days.  Contrary to Valverde's representations, plaintiff had 186.4 creditable sick days at the

end of the 2022-23 school year, short of the 194 required for her to receive a full retirement

pension.  Plaintiff sought to remedy the situation promptly by acquiring eight more days of

creditable service.  District 65 was slow to remedy the situation, although by October 3, 2023,

plaintiff learned that District 65 planned to rehire her for eight more days.  By October 23, 2023,

plaintiff had acquired the necessary eight days of additional service required to qualify for a full

retirement.  But, due to District 65's delay and unresponsiveness, plaintiff only worked four

additional days at District 65.  Plaintiff's other four days came from working at District 70,

another school district in the Chicago area.

## LEGAL STANDARD

A motion to dismiss under Rule 12(b)(6) challenges the sufficiency of the complaint.

Hallinan v. Fraternal Order of Police of Chi. Lodge No. 7, 570 F.3d 811, 820 (7th Cir. 2009).  To

survive a motion to dismiss, plaintiff must clear two hurdles: (1) "the complaint must describe

the claim in sufficient detail to give the defendant fair notice of what the claim is and the grounds

upon which it rests;" and (2) "its allegations must plausibly suggest that the plaintiff has a right

to relief, raising that possibility above a 'speculative level.'"  Tamayo v. Blagojevich, 526 F.3d

1074, 1084 (7th Cir. 2008).  At this stage, "the court must construe all of the plaintiff's factual

allegations as true and must draw all reasonable inferences in the plaintiff's favor."  Virnich v.

Vorwald, 664 F.3d 206, 212 (7th Cir. 2011).  "A claim has facial plausibility when the plaintiff

pleads factual content that allows the court to draw the reasonable inference that the defendant is

liable for the misconduct alleged."  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009).

A. Count One: Interference with plaintiff's rights afforded under the FMLA

Defendants move to dismiss Count One, which alleges that District 65, Khelighati, Valverde, and Shklover's failure to provide plaintiff with proper documentation and information to use FMLA leave constituted "interfering with, restraining, or denying the exercise or attempted exercise of an employee's FMLA rights," which is prohibited under 29 U.S.C. § 2615. Defendants correctly argue that to establish a claim for interference with rights afforded by the FMLA, plaintiff must establish that: (1) she was eligible for FMLA protections; (2) her employer was covered by the FMLA; (3) she was entitled to take leave under the FMLA; (4) she provided sufficient notice of intent to take leave; and (5) her employer interfered with or restrained FMLA benefits to which she was entitled. Ziccarelli v. Dart, 35 F.4th 1079, 1089 (7th Cir. 2022). In addition to the five elements, plaintiff must also show that defendants' actions prejudiced her. Id.

Defendants argue that the complaint fails to meet the fourth and fifth elements of an FMLA interference claim and fails to plead prejudice. Defendants contend that the complaint does not meet the fourth element because plaintiff never applied for FMLA leave and did not provide sufficient notice of her intent to take such leave. Defendants contend that the complaint does not meet the fifth element because a failure to inform of options under the FMLA does not constitute interference. Defendants contend that the complaint does not establish prejudice because ultimately, she suffered no loss of compensation and currently receives a full pension.

Plaintiff responds that her complaint meets the fourth and fifth elements and establishes prejudice. On notice, plaintiff argues that her communications notifying District 65 staff that she needed to take time off to tend to her dying husband constitute sufficient notice under the

FMLA. On interference, plaintiff argues that defendants' failure to inform her of the right to seek FMLA leave constitutes interference with her rights under the FMLA. On prejudice, plaintiff argues that she has suffered substantial economic damage, out of pocket expenses, emotional distress, and legal fees.

The court agrees with plaintiff. An employee is not required to specifically request FMLA leave to put an employee on notice that they qualify for FMLA leave. Instead, "[t]he employee's notice obligation is satisfied so long as he provides information sufficient to show that he likely has an FMLA-qualifying condition." Burnett v. LFW, Inc., 472 F.3d 471, 479 (7th Cir. 2006). While courts have had to grapple with how much follow-up an employer must undertake after receiving a leave request from an employee, in this case there was no ambiguity as to why plaintiff was seeking leave. See Lutes v. United Trailers, Inc., 950 F.3d 359, 366 (collecting cases and discussing the "spectrum between" an employee informing their employer that their mother suffered a "diabetic coma" and "merely reporting a twisted knee."). According to the complaint, plaintiff's employer had been aware that plaintiff's husband was diagnosed with brain cancer since 2020. Plaintiff's communications with her employer left no doubt as to the serious health condition behind her leave request; she was caring for her husband in the last stages of terminal brain cancer. Consequently, the complaint adequately pleads the notice element of an FMLA interference claim.

The court agrees with plaintiff that defendants' failure to inform her of her right to seek FMLA leave constitutes interference or restraint with the FMLA benefits to which she was entitled. Establishing the fifth element of an FMLA interference claim does not require denial of FMLA benefits. "Interference or restraint alone is enough to establish a violation, and a remedy is available under § 2617 if the plaintiff can show prejudice from the violation." Ziccarelli, 35

F.4th at 1089. The term "interference" is not defined in the FMLA. The Seventh Circuit has not squarely answered the question of whether a failure to give an employee notice of available FMLA rights constitutes interference.

Once an employer receives sufficient notice to determine that the FMLA applies to an employee's leave request, the employer has a duty to notify the employee of their FMLA rights. See 29 C.F.R. § 825.300(b)(1) ("when the employer acquires knowledge that an employee's leave may be for an FMLA–qualifying reason, the employer must notify the employee of the employee's eligibility to take FMLA leave within five business days, absent extenuating circumstances."). Courts outside of the Seventh Circuit have held that a failure to provide notice of FMLA rights to an employee can constitute interference so long as that failure prejudiced the employee. See Ridgeway v. Royal Bank of Scotland Grp., No. 3:11-CV-976 VLB, 2013 WL 1985016, at *18 (D. Conn. May 13, 2013) (explaining that "the Second Circuit has recognized the potential for an interference cause of action premised upon an employer's failure to post a notice where that failure leads to some injury.") (collecting cases).

The decisions holding that failure to provide notice can constitute interference under the FMLA comport with the rationale of Seventh Circuit and Supreme Court case law on FMLA interference. In Zicarrelli, the Seventh Circuit reversed a district court order granting an employer's motion for summary judgement in part on the basis that, "[t]here is also evidence in the record that [employer's] statements prejudiced Ziccarelli by affecting his decisions about FMLA leave." 35 F.4th at 1089. In Lutes v. United Trailers, Inc., the Seventh Circuit held that an employee could survive summary judgment on remand if he could show "that he would have structured his leave differently had he received the proper information." 950 F.3d 363, 368 (2020). In Ragsdale v. Wolverine Worldwide, Inc., the Supreme Court held that if an employee

8

"is not informed that her absence qualifies as FMLA leave," then "the employer's failure to give the notice required by the regulation could be said to 'deny,' 'restrain,' or 'interfere with' the employee's exercise of her right[s]." 535 U.S. 81, 90 (2002). These holdings are on the prejudice prong, rather than the interference prong specifically at issue here. Nevertheless, they are consistent with the contention that an FMLA interference claim can be based on informational deficiencies that cause employees to structure their leave differently than they might have. Consequently, this court concludes that plaintiff's interference cause of action can be premised on the allegation that defendants failed to provide notice, so long as plaintiff adequately pleads prejudice from that lack of notice.

Plaintiff adequately alleges that the failure to provide notice prejudiced her. The complaint alleges that plaintiff was required to work eight additional days, which she had to arrange through two separate school districts. The complaint also alleges that plaintiff had to expend considerable time and energy to interface with District 65 and TRS staff to sort out her retirement benefits. Additionally, plaintiff received no income at all over the summer when, according to the complaint, she otherwise would have had her retirement been sorted out properly.[2] According to the complaint, these consequences occurred because she was denied the opportunity to make informed and timely decisions about leave options that she would have been entitled to under the FMLA. The complaint alleges significant financial harm that could have been avoided had plaintiff been properly informed of her FMLA rights.

While plaintiff has adequately stated a claim for FMLA interference, the details of the

---

[2] The complaint does not clearly explain why plaintiff did not receive income when she otherwise would have. The court suspects that plaintiff did not receive income because she could not officially initiate her retirement with less than the requisite amount of creditable service without locking in the reduced pension amount, but this mechanism is not fully explained in the complaint. Nevertheless, at this stage the court accepts the plaintiff's factual allegations as true and draws all reasonable inferences in her favor.

involvement of specific defendants differs. The court now turns to analyzing plaintiff's FMLA interference claim in relation to specific defendants.

According to complaint, Valverde was required to inform plaintiff of her rights under the FMLA and failed to do so. As described above, plaintiff and Valverde engaged in extensive communication about plaintiff's plan to take leave to care for her ailing husband, which triggered Valverde's duty to inform plaintiff of her rights under the FMLA. Valverde failed to fulfill this duty, thus interfering with plaintiff's exercise of her FMLA rights. While the issue is not contested by the parties, an "individual may be held liable under the FMLA only if she is an 'employer,' which is defined as encompassing 'any person who acts, directly or indirectly, in the interest of an employer to any of the employees of such employer.'" Graziadio v. Culinary Institute of America, 817 F.3d 415, 422 (2d Cir. 2016) (citing 29 U.S.C. § 2611(4)(A)(ii)(I)); see also Eppinger v. Caterpillar Inc., 682 Fed. App'x 479, 481 (7th Cir. 2017) (approvingly citing Graziadio). Valverde, acting within her responsibilities as District 65's "HR Operations Specialist," fulfills this definition, as does, of course, District 65. Consequently, defendants' motion to dismiss Count One is denied as to Valverde and District 65.

On the other hand, Khelighati and Shklover's more limited interactions with plaintiff do not meet the elements of FMLA interference. Plaintiff notified Khelighati that she planned to retire. That email alone (which is the only alleged communication between them) did not trigger an FMLA notice obligation on Khelighati, because plaintiff did not notify Khelgati that she planned to take leave. Thus, regarding Khelighati, plaintiff's claim fails on the fourth prong because plaintiff did not provide Khelighati sufficient notice of intent to take leave. See Ziccarelli, 35 F.4th at 1089. Consequently, defendants' motion to dismiss Count One as to Khelighati is granted.

10

Shklover's interaction with plaintiff does not constitute FMLA interference for a similar reason. According to the complaint, Shklover was pulled into a May 8, 2023, email chain between plaintiff and Valverde to confirm the total quantity of sick days plaintiff had at the time. According to the complaint, the original email from plaintiff asked Valverde the following:

> Please confirm as of today I have 209.4 days left and I need 194 for you to give to TRS. So I have 15.4 days to use as I need them.
>
> Thank You

At this point, Valverde added Shklover to the email thread to confirm that plaintiff indeed had 209.4 sick days.

Plaintiff's email did not provide Shklover with sufficient notice of her intent to take leave. As discussed above, "[t]he employee's notice obligation is satisfied so long as he provides information sufficient to show that he likely has an FMLA-qualifying condition." Burnett, 472 F.3d at 480. Plaintiff's email at most could be read to communicate that she planned to use the 15.4 days that she thought she had. But the email did not provide sufficient information to Shklover that plaintiff likely had an FMLA-qualifying condition. Plaintiff does not allege that Shklover, unlike Valverde, had any information about her leave request outside of this May 8, 2023, email. Thus, plaintiff's FMLA interference claim against Shklover falls on the sufficient notice element. Consequently, defendants' motion to dismiss Count One as to Shklover is granted.

B. Count Two: Procedural due process

Defendants move to dismiss Count Two, which alleges that defendants' failures to properly account for plaintiff's eligible sick says deprived plaintiff of a protected property interest in her early retirement without due process of law. Defendants correctly argue that to

11

prevail on a deprivation of property right claim, plaintiff must show that: (1) there was a cognizable property right; (2) the property right was deprived; and (3) the deprivation occurred without due process.  See <u>Khan v. Bland</u>, 630 F.3d 519, 527 (7th Cir. 2010).

First, defendants argue that plaintiff fails to plead a valid property right because she had no property right in her early retirement until TRS determined how much credit she would receive for unused sick days.  See 80 Ill. Admin. Code 1650.350.  Second, defendants argue that even if plaintiff did plead a valid property right, she was not deprived of it because she ultimately received all of the sick days she was entitled to and a full, non-reduced pension.  Finally, defendants argue that even if plaintiff were deprived of a property right, plaintiff was not denied due process because there is a state remedy available pursuant to the Illinois Pension Code.

Plaintiff responds that she was entitled to her early retirement as a matter of Illinois statute, 40 ILCS 5/16-133, regardless of the process outlined in the Illinois Administrative Code. On deprivation, plaintiff argues that even though she ultimately received her full pension, she was deprived of it for a period of several months.  On process, plaintiff argues that she filed a grievance that was denied by the Illinois Educational Labor Relations Board.

The court finds that plaintiff fails to state a claim for the deprivation of a valid property right.  Assuming without deciding that plaintiff had a valid property right in her early retirement, plaintiff has failed to plead a <u>deprivation</u> of that property right.  The complaint characterizes defendants as having committed "gross errors," "gross and reckless errors," "grave errors," and "gross negligence" in failing to properly calculate plaintiff's creditable sick days.  But "the Due Process Clause is simply not implicated by a <u>negligent</u> act of an official causing unintended loss of or injury to life, liberty, or property."  <u>Daniels v. Williams</u>, 474 U.S. 327, 328 (1986)

(emphasis in original); see also id. at 331 (explaining that "[h]istorically, this guarantee of due process has been applied to deliberate decisions of government officials to deprive a person of life, liberty, or property." (emphasis in original)).  The court is sympathetic to the harm that plaintiff suffered due to defendants' alleged gross errors.  Nevertheless, the Due Process Clause cannot provide plaintiff with relief from those errors. Consequently, defendants' motion to dismiss Count Two is granted.

C.  Count Five: Breach of contract

Defendants move to dismiss Count Five, which alleges that District 65 breached its obligations to plaintiff under the "Professional Agreement between the Board of Education of School District No. 65 Evanston, Illinois and District 65 Educators' Council for School Years 2019-2020 through 2023-2024" (the "Agreement").  Among other things, defendants argue that District 65 met its contractual obligations under the Agreement.  Defendants argue that plaintiff received the quantity of creditable sick days to which she was entitled under the Agreement, even if she was misinformed as to what that quantity was.

Plaintiff responds that District 65 and its agents were obligated to properly administer the terms of the Agreement and to properly account for plaintiff's sick days that were creditable towards early retirement and failed to do so.  To support this contention, plaintiff references two articles of the Agreement. Article XV establishes a "Sick Leave Bank," which District 65 was obligated to administer.  Article XVII, entitled "Professional Compensation and Related Provisions," contains, among other things, the eligibility requirements for retirement annuities.

The court finds that plaintiff's breach of contract claim fails because District 65 was not obligated under the Agreement to ensure that calculations of plaintiff's creditable sick days

would be free from error. Plaintiff fails to identify a provision of the agreement containing the obligation that she alleges was breached.

Article XV's "Sick Leave Bank" provisions are simply not relevant to plaintiff's breach of contract claims. Plaintiff alleges that District 65 breached its contractual obligations when its agents miscalculated plaintiff's creditable sick days. The "Sick Leave Bank" established in Article XV is not implicated in this miscalculation. None of the factual allegations in the complaint, other than the references to the terms of Article XV, mention the "Sick Leave Bank." Plaintiff does not allege that the miscalculation had any relation to the "Sick Leave Bank."[3]

Article XVII does not obligate District 65 to properly calculate plaintiff's balance of creditable sick days. Article XVII contains no language creating such an obligation. Nor is Article XVII related to the miscalculation of plaintiff's creditable sick days in a broader sense. Article XVII contains the eligibility requirements for the retirement annuity that plaintiff qualified for. The complaint alleges that District 65 and its agents miscalculated the quantity of her sick days that were eligible to be counted towards her years of creditable service. That miscalculation was costly to plaintiff not because it affected her ability to qualify for an annuity according to Article XVII, but because it would affect the total amount of her annuity according to 40 ILCS 5/16-133(a)(B), the Illinois statutory provision governing TRS annuity amounts for early retirement.[4] Article XVII does not contain any provisions concerning early retirement, or the calculation of creditable sick days that count towards an early retirement.

---

[3] References in the complaint to plaintiff's "sick bank" refer to her personal accumulated sick days. This is distinct from the "Sick Leave Bank," a program through which employees contribute a day of their sick leave annually to provide extended sick leave to those members who incur a major illness or major disability.
[4] The relevant part reads: "The amount of the retirement annuity determined under this paragraph (B) shall be reduced by 1/2 of 1% for each month that the member is less than age 60 at the time the retirement annuity begins. However, this reduction shall not apply [ ] if the member has at least 35 years of creditable service."

Neither of the contractual provisions cited by plaintiff create the obligation that she alleges District 65 breached. Consequently, defendants' motion to dismiss Count Five is granted.[5]

### D. Count Six: Promissory estoppel

Defendants moves to dismiss Count Six, which is a claim for promissory estoppel against District 65, Valverde, and Shklover. Defendants correctly argue that to establish a successful promissory estoppel claim in Illinois, plaintiff must prove that "(1) defendant made an unambiguous promise to plaintiff, (2) plaintiff relied on such promise, (3) plaintiff's reliance was expected and foreseeable by defendants, and (4) plaintiff relied on the promise to its detriment." Newton Tractor Sales, Inc. v. Kubota Tractor Corp., 906 N.E.2d 520, 523-24 (Ill. 2009). Defendants primarily contest the first of these four elements. According to defendants, the communications about sick leave were ambiguous and were not a promise on the part of defendants. Defendants argue that the alleged communications do not express an intent by any of the defendants involved—Shklover, Valverde, or District 65—to be bound by the terms of a promise.

Plaintiff responds that her communications with District 65 employees contained multiple unambiguous statements that assured her that she had accrued the requisite amount of unused sick days to retire with a full pension. Plaintiff contests defendants' framing of the issue as a "miscalculation," and instead insists that her communications with District 65 employees

---

[5] The court grants the motion to dismiss Count Five without reaching the other issues detailed in briefing, such as whether plaintiff was required to attach the alleged contract to the complaint, whether plaintiff's exclusive remedy was to file a grievance, and whether that remedy was exhausted. Even if plaintiff prevailed on all those issues, the court would grant defendants' motion to dismiss because plaintiff failed to establish an obligation in the Agreement that was breached by defendants, as explained above.

constituted an unambiguous promise upon which she relied to her detriment.

The court finds that the assurance that plaintiff received from District 65 employees do no constitute a "promise" for the purposes of promissory estoppel. In Illinois, the formation of a contract requires four elements: offer; acceptance; mutual assent; and consideration. See e.g., Dumas v. Infinity Broadcasting Corp., 416 F.3d 671, 678 (7th Cir. 2005); Matthews v. Chicago Transit Authority, 51 N.E.3d 753, 780 (Ill. 2016). The doctrine of promissory estoppel is recognized as creating a contract implied in fact, which imposes a contractual duty based on a promissory expression by the promisor that shows an intention to be bound." Matthews, 51 N.E.3d at 780. "Under Illinois law, a promissory estoppel claim will succeed where the other elements of a contract exist (offer, acceptance, and mutual assent), but consideration is lacking." Id.

The problem for plaintiff is that the contract implied in fact that she alleges lacks more than consideration. The conversations between plaintiff and District 65 employees about her sick leave do not reflect offer, acceptance, or mutual assent.[6] This is because the conversations at issue here are fundamentally dissimilar to a contracting or quasi-contracting scenario; they do not reflect two parties seeking to create mutual obligations. Among other reasons, this is because District 65 was not in a position to act as a promisor. District 65 does not have the power to override the statutory provision governing the terms of early retirement. Instead, the conversations reflect plaintiff's inquiry to District 65 as to the state of a condition—her balance of creditable unused sick days—that relate to the triggering of statutory provision discussed

---

[6] Even when read expansively, the complaint does not allege that the communications between plaintiff and District 65 employees reflected offer, acceptance, or mutual assent. There were no new obligations being negotiated or discussed between the parties that were not already reflected in the Agreement and Illinois statute.

above, 40 ILCS 5/16-133(a)(B). The court recognizes that it was frustrating and costly for plaintiff to receive inaccurate information from District 65 relating to the status of TRS's statutory obligations to her. But that inaccurate information is not "a promissory expression by the promisor that shows an intention to be bound." Matthews, 51 N.E.3d at 780.

The authorities that plaintiff relies upon are not on point because they both concern a promisor that intended to be bound at the time of the promise. Or, to put it in other words, they both concern a defendant that had agreed to undertake some new obligation. Brown-Wright v. East St. Louis School District 189, 2016 IL App (5th) 150148-U (March. 24, 2016) and Lawrence v. Board of Education of School District 189, 503 N.E.2d 1201 (Ill. App. 5th Dist. 1987), both concern retired school employees that were denied payment for accrued sick leave that was promised to them under school policy. Crucially, both defendants in these cases promised to undertake some new obligation that they later attempted to renege. These cases are not analogous to the facts here; plaintiff does not allege that District 65 promised her payments that were later denied. Instead, plaintiff alleges that District 65 gave her incorrect information relating to an existing statutory obligation, which caused her to make unnecessarily costly choices in structuring her leave. Consequently, defendants' motion to dismiss Count Five is granted.

E. Count Seven: Intentional infliction of emotional distress ("IIED")

Defendants move to dismiss Count Seven, which alleges that defendants intentionally inflicted emotional distress upon plaintiff by failing to properly account for her retirement eligible sick days and failing to provide her with the means to make up her eight-day shortfall so that she could receive a full pension. Defendants correctly state the legal standard for an IIED

claim under Illinois state law.  To state an actionable IIED claim, plaintiff must allege: (1) the conduct involved was truly extreme and outrageous; (2) the actor either intended that his conduct inflict severe emotional distress or knew that there was at least a high probability that his conduct would cause severe emotional distress; and (3) the conduct actually caused severe emotional distress.  See McGrath v. Fahey, 533 N.E.2d 806, 809 (Ill. 1988).

Defendant argues that the complaint fails to allege sufficient facts to demonstrate that defendants' alleged actions were extreme and outrageous.  Defendant also argues that the complaint fails to allege sufficient facts to show that defendants intended to cause plaintiff severe emotional distress or knew with a high probability that their actions would do so.  Defendant Baker separately argues that the complaint fails on the third element because plaintiff has not alleged that she has been hospitalized or sought medical care for her emotional distress.

Plaintiff responds that the conduct alleged in the complaint meets the extreme and outrageous standard because, as plaintiff puts it: "What's more uncivilized than failing to properly calculate the proper number of sick days that can be allocated towards a teacher's retirement – under the circumstances presented by this case?"  On the second element, plaintiff argues that defendants need not intend to inflict severe emotional stress; defendants' knowledge of a high probability that their actions would inflict severe emotional distress is sufficient.  On the third element, plaintiff argues that an employee is not required to plead that she sought medical attention to prevail on an IIED claim.

The court agrees with defendants.  The bar for IIED claims in Illinois is exceedingly high.  See e.g., McGrath, 533 N.E.2d at 809 (explaining that "[t]he law intervenes only where the distress inflicted is so severe that no reasonable man could be expected to endure it."); Feltmeier

v. Feltmeier, 798 N.E.2d 75, 80-81 (Ill. 2003) (explaining that "the nature of the defendant's conduct must be so extreme as to go beyond all possible bounds of decency and be regarded as intolerable in a civilized community"). The conduct alleged in the complaint does not meet this high bar.

While the court understands that the failures of District 65 staff were infuriating, such failures are not the type of extreme conduct required to support an IIED claim. Crucially, there is no allegation that the improper calculation of plaintiff's retirement creditable sick days was an intentional act. Intentional acts underlie all intentional torts, such as IIED. Cf. Hayes v. Illinois Power Co., 587 N.E.2d 559, 564 (Ill. App. 4th Dist. 1992) (distinguishing between emotional distress resulting from an intentional act, as required for an IIED claim, and emotional distress resulting from negligence); Restatement (Second) of Torts §8A ("The word 'intent' is used throughout the Restatement of this Subject to denote that the actor desires to cause consequences of his act, or that he believes that the consequences are substantially certain to result from it.").

This point is distinct from the intentionality analysis of the second IIED element, which asks if defendants intended to (or knew with a high likelihood that their actions would) inflict severe emotional distress. Regardless of defendants' state of mind as to how a miscalculation would affect plaintiff emotionally, plaintiff does not allege that defendants miscalculated her retirement creditable sick days on purpose.

The types of acts that courts have found to meet the high bar of IIED (and the types of acts that constitute intentional torts generally) are acts that were undertaken intentionally, not accidents that resulted in emotional distress for their victims. A separate body of law—negligent infliction of emotional distress—governs the latter situations. See Schweihs v. Chase Home

Finance, LLC, 77 N.E.3d 50, 58 (Ill. 2016) (explaining the history of the court's precedent on negligent infliction of emotional distress). Among other reasons, this is because the standard for IIED, conduct that is "so extreme as to go beyond all possible bounds of decency and to be regarded as intolerable in a civilized community," reflects a harsh judgement of the agency of the actor. Feltmeier, 798 N.E.2d at 80-81. Accordingly, the cases cited by plaintiff involve actors who intentionally exercised their agency.[7] A bureaucratic mistake, though infuriating, does not warrant that same sort of harsh judgement, in large part because it is not the result of an intentional exercise of an actor's agency. Thus, the unintentional failure to properly calculate plaintiff's retirement creditable sick days does not rise to the level of the extreme conduct required for an IIED claim.

The court also concludes that defendants' alleged failure to remedy plaintiff's eight-day creditable service shortfall does not meet the high standard for IIED. The complaint alleges that "[d]efendants turned their backs on Reitman by failing to promptly provide her with means and opportunity to obtain additional working days." But the complaint also alleges that District 65 offered to re-hire plaintiff as a substitute for eight days, and that plaintiff did in fact work for four days as a District 65 substitute. While, at this stage, the court will draw all reasonable inferences in the plaintiff's favor, the complaint at best alleges that District 65 was intentionally

---

[7] Sharma v. Bd. of Trustees of Univ. of Ill., 404 F. Supp. 3d 1183, 1205 (N.D. Ill. 2019), involved an employer who pressured an employee to approve illegal expenses and subjected that employee to unwarranted medical evaluations and falsely told his coworkers that he was dangerous and potentially violent. Piech v. Arthur Andersen & Co., 841 F. Supp. 825, 831-32 (N.D. Ill. 1994), which granted a motion to dismiss an IIED claim, involved repeated sexual harassment and a proposition for a sexual act. Doe v. Calumet City, 641 N.E.2d 498, 507 (Ill. 1994), involved an officer who demeaned a women clad only in underwear after she had just narrowly escaped an attempted rape while her children were still inside her home with the rapist. In Honaker v. Smith, 256 F.3d 477, 491 (7th Cir. 2001), the defendant allegedly set fire to the plaintiff's house. While this list does not exhaust every case cited by plaintiff, it illustrates the point that IIED requires intentional action on the part of a defendant. Regardless of their states of mind as to the effects of their actions, the defendants in these cases intended to undertake these actions. These cases are fundamentally dissimilar to the facts here, because defendants did not intentionally undertake the action complained of. These cases also answer plaintiff's rhetorical question; they involve conduct far more uncivilized than failing to properly account for a teacher's retirement creditable sick days.

slow to be helpful. District 65's lack of urgency in helping plaintiff get the extra eight days of work she needed to qualify for a full retirement is condemnable, but it is not "so extreme as to go beyond all possible bounds of decency and to be regarded as intolerable in a civilized community." <u>Feltmeier</u>, 789 N.E.2d at 80-81. Thus, this claim fails on the first IIED element. Consequently, the court grants defendants' motion to dismiss Count Seven.

<u>**CONCLUSION**</u>

For the reasons explained above, defendants' motion to dismiss (Doc. 21) is denied in part—with respect to defendants Valverde and District 65 for Count One—and granted as to all defendants on all other remaining counts. Baker's motion to dismiss (Doc. 19) is granted as to Counts Two and Seven. Defendants Valverde and District 65 are directed to answer the complaint on or before February 18, 2025. The remaining parties are directed to file a joint status report using this court's form on or before February 25, 2025.

**ENTER:**

**Robert W. Gettleman**
**United States District Judge**

**DATE: January 28, 2025**